UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-80216-CIV-COHN

CONGRESSMAN ROBERT WEXLER;
COMMISSIONER ADDIE GREENE,
COMMISSIONER BURT AARONSON
and TONY FRANSETTA,

        Plaintiffs,

v.

THERESA LEPORE, SUPERVISOR
OF ELECTIONS FOR PALM BEACH
COUNTY, FLORIDA; KAY CLEM,
SUPERVISOR OF ELECTIONS FOR
INDIAN RIVER COUNTY, FLORIDA,
AND PRESIDENT OF THE FLORIDA
ASSOCIATION OF SUPERVISORS OF
ELECTION; GLENDA E. HOOD,
SECRETARY OF STATE OF FLORIDA,

        Defendants.

_____/



## MEMORANDUM OPINION

**THIS CAUSE** came before the Court upon Plaintiffs's Complaint alleging

violations of the United States Constitution and is brought pursuant to 42 U.S.C. § 1983.

## INTRODUCTION

Plaintiffs, Robert Wexler, a Congressman representing the 19th Congressional

District of Florida; Addie Greene and Burt Aaronson, Palm Beach County

Commissioners; and Tony Fransetta, a registered Florida voter, seek declaratory and

1



injunctive relief against Defendants Glenda Hood, Secretary of State; Theresa Lepore, Supervisor of Elections for Palm Beach County; and Kay Clem, Supervisor of Elections for Indian River County.  Plaintiffs contend that the touchscreen paperless voting systems used in fifteen of Florida's sixty-seven counties lack a manual recount procedure which is available in the remaining fifty-two counties which use an optical scan voting system.  Plaintiffs allege that this "non-uniform, differential standard" violates their rights to due process and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution.

The case was tried to the Court on October 18, 19 and 20, 2004.  Given the expedited nature of the case, the Court directed the parties to submit Proposed Findings of Fact and Conclusions of Law and briefs regarding the issue of liability prior to the start of trial.  Upon consideration of the testimony and other evidence presented, the parties' Proposed Findings of Fact and Conclusions of Law [DE ## 88, 94, 97], the parties' briefs regarding liability [DE ## 62, 71], and argument of counsel, pursuant to Federal Rule of Civil Procedure Rule 52, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT[1]

### A.    Statutory Framework

Florida's election system consists of the Legislature, the Department of State, and the Supervisors of Elections for Florida's sixty-seven counties.  Within the statutory framework governing elections, the Legislature has authorized the Department of State

---

[1]  To the extent any of these Findings of Fact constitute Conclusions of Law, they are hereby adopted as both.

to issue binding interpretations of the election laws.  Fla. Stat. §§ 97.012(1), 106.23(2).

In the 1970s, the Florida Legislature enacted the Electronic Voting Systems Act ("the EVSA"), approving electronic equipment for use in the state. Fla. Stat. §§ 101.5601-101.5614.  Section 101.5606 of the EVSA specifically sets forth certain requirements that an electronic or electromechanical system must meet in order to be approved by the Department of State.  *See* Fla. Stat. §§ 101.5605, 101.5606.  In addition to these requirements, the Department of State is responsible both for adopting rules that establish minimum standards for electronic voting systems and for reviewing such rules each odd-numbered year.  Fla. Stat. § 101.015.  Based on compliance with these requirements and standards, the Department of State has the authority to approve or disapprove any voting system.  *See* Fla. Stat. §§ 101.5605, 101.015.  Additionally, the Department of State is responsible for adopting uniform rules for the purchase, use, and sale of voting equipment in the state.  Fla. Stat. § 101.294.

The decision to use a particular electronic voting system in a county is left to each county's board of county commissioners.  "The board of county commissioners of any county. . . may, upon consultation with the supervisor of elections, adopt, purchase or otherwise procure, and provide for the use of any electronic or electromechanical voting system approved by the Department of State in all or a portion of the election precincts of that county."  Fla. Stat. § 101.5604; *see also* Fla. Stat § 101.294.

Florida's recount procedures are governed by sections 102.141 and 102.166 of the Florida statutes, which create a two-stage process for recounts.  During the first stage, if the margin of victory is one-half of a percent or less, a machine recount occurs.

3

Fla. Stat. § 101.141(6).  In counties with voting systems using paper ballots, this recount consists of putting each ballot through the automatic tabulating equipment and determining whether the returns correctly reflect the votes cast.  Fla. Stat. §101.141(6)(a).  The recount in counties not using paper ballots consists of examining the counters on the precinct tabulators to ensure that the total returns on the tabulators equals the overall election return. Fla. Stat. § 101.141(b).

The second stage of the recount process occurs if the margin of victory is one-quarter of a percent or less.  Fla. Stat. § 102.166.[2]  In such an instance, "a manual recount of the overvotes and undervotes cast in the entire geographic jurisdiction of such office or ballot measure" shall be conducted. *Id.*  When conducting the manual recount, a "vote cast for a candidate or ballot measure shall be counted if there is a clear indication on the ballot that the voter has made a definite choice."  Fla. Stat. § 102.166(5)(a).  The statute further dictates that the "Department of State shall adopt specific rules for each certified voting system prescribing what constitutes a 'clear indication on the ballot that the voter has made a definite choice,'" and also "adopt detailed rules prescribing additional recount procedures for each certified voting system which shall be uniform to the extent practicable."  Fla. Stat. §§ 102.166(5)(b) & (6)(d).

**B.    Voting Systems**

Currently, there are two types of electronic voting systems certified for use in

---

[2] A candidate has the right to demand a manual recount if the margin is between one-quarter and one-half of a percent.  Fla. Stat. § 102.166(2)(a).

Florida: the optical scan system and the touchscreen system.[3]  The parties presented evidence at trial regarding both types of voting machines and how they function. A voter using the optical scan system marks a paper ballot by filling in the bubble or completing the arrow next to the candidate of his/her choice, after which the ballot is run through the optical scan machine for tabulation.  In contrast, when using a touchscreen system, a voter does not mark a paper ballot but instead makes selections on a computer screen. The touchscreen system gives the voter the opportunity to review the selections and it is only after the voter indicates approval, that the selections are recorded in the machine's electronic memory.

According to the testimony presented at trial, the ballot on a touchscreen machine appears on several succeeding screen images rather than on a single sheet of paper as with optical scan machines.  As a voter completes his/her selection process on a given screen, the machine instructs the voter to touch the screen to continue to the next page. Theresa Lepore testified that on the Sequoia touchscreen voting system, if a voter chooses not to cast a vote for a particular race or issue, the machine notifies the voter that he/she has not made a selection.  After receiving this notification, the voter may continue to the next screen, whether or not he/she chooses to make a selection before continuing.  Once the voter has navigated through all of the screen images and reaches the end of the ballot, the touchscreen machine provides the voter with a review of all of his/her selections for all of the races and/or issues on the ballot.  The voter then casts

---

[3]  There are three distinct brands of touchscreen systems, each slightly different from the other.  These brands are referred to as ES&S, Sequoia, and Diebold.

his/her ballot by pressing the vote button to accept the selections.[4]  If a voter has not voted for a particular race or issue, the machine indicates this fact to the voter on the review screen.  The voter is then given an opportunity to go back to the screen on which that race or issue appears and make a selection, or to cast his/her ballot without making a selection for that particular race or issue.

In the past, ballot problems have occurred in the form of either overvotes or undervotes.  The Florida Statutes define an overvote as occurring when "the elector marks or designates more names than there are persons to be elected to an office or designates more than one answer to a ballot question, and the tabulator records no vote for the office or question."   Fla. Stat. § 97.021(21).  An undervote occurs when "the elector does not properly designate any choice for an office or ballot question, and the tabulator records no vote for the office or question."  Fla. Stat. §  97.021(34).  Overvotes and undervotes collectively can be referred to as residual votes.  The touchscreen machines do not allow a voter to cast a vote for more than one candidate in a particular race and thereby eliminate overvotes.[5]  (*See* Complaint, Exhibit C, Florida Systems Standards at 21).  With respect to undervotes, touchscreen machines only permit an undervote after notifying the voter at least once that he/she has not selected a candidate for a particular race as well as giving the voter an opportunity to review the selections before casting his/her ballot.

_____

[4]  On the ES&S voting system, the voter presses the flashing red "vote" button to cast his or her ballot, while on the Diebold and Sequoia, the voter touches the screen to cast his or her ballot.

[5]  Plaintiffs' counsel conceded during closing arguments that the touchscreen machines do not permit an overvote to be cast.

### C.    Emergency Rule

Pursuant to the mandates of Fla. Stat. § 102.166, the Department of State issued

Rule 1S-2.031 pertaining to recount procedures.[6]  Subsection (6) dictates the

procedures to be followed for conducting a manual recount in those counties using

optical scan machines.  Subsection (7) dealt with recount procedures for touchscreen

machines.  Rule 1S-2.031(7) provided as follows:

> When a manual recount is ordered and touchscreen ballots are used, no
> manual recount of undervotes and overvotes cast on a touchscreen
> system shall be conducted since these machines do not allow a voter to
> cast an overvote and since a review of undervotes cannot result in a
> determination of voter intent as required by Section 102.166(5), F.S.  In
> this case, the results of the machine recount conducted pursuant to
> paragraph (5)(c) shall be the official totals for the touchscreen machines.

Florida Administrative Code Rule 1S-2.031(7).

A group of entities unrelated to Plaintiffs brought a rule challenge, pursuant to Fla.

Stat § 120.56(3), to determine the validity of the above rule.  On August 27, 2004, Judge

Susan B. Kirkland of the Division of Administrative Hearings issued an opinion in the

matter of *ACLU v. Department of State*, Case No. 04-2341RX.  Judge Kirkland ruled that

the Department of State exceeded its rulemaking authority in promulgating Rule 1S-

2.031(7).  Though she did not conclude that the Department of State acted arbitrarily or

capriciously when it promulgated the rule, Judge Kirkland did determine that Florida

statutes clearly contemplate manual recounts to be done on each certified voting

---

[6] Secretary Hood first promulgated the rule as a proposed administrative rule in December 2003.  (*See* Complaint, Exhibit D.)  It underwent several amendments, the latest of which was promulgated on April 13, 2004.  *See Final Order, ACLU v. Department of State*, Case No. 04-2341RX, slip op. at ¶ 18 (Division of Administrative Hearings, Aug. 27, 2004).

system, including touchscreen machines. *See Final Order*, *ACLU v. Department of State*, Case No. 04-2341RX, slip op. at ¶ 34 (Division of Administrative Hearings Aug. 27, 2004). In concluding that the Department of State exceeded its grant of rulemaking authority, Judge Kirkland stated as follows:

> [The Department of State] has the authority to promulgate procedures for manual recounts in addition to those set forth in section 102.166, Florida Statutes (2004), and is required to address minimum areas in those rules, but it does not have the authority to abolish manual recounts for certain types of voting equipment.

*Id*. at ¶ 36.

The Department of State did not appeal the decision. Rather, the Department of State engaged in emergency rulemaking pursuant to chapter 120 of the Florida Statutes and promulgated Emergency Rule 1SER04-1 regarding manual recount procedures for touchscreen voting systems. The emergency rule was filed on Friday, October 15, 2004 at 4:09 p.m. The Department of State determined that emergency rulemaking was necessary for the following reasons: "1)To put in place specified and uniform standards for conducting manual recounts of touchscreen voting systems prior to the 2004 General Election and 2) To ensure and maintain the efficiency, integrity and public confidence in the electoral process." Rule 1SER04-1, Specific Reasons for Finding an Immediate Danger to the Public Health, Safety and Welfare.

The emergency rule explains that a "ballot image" means an electronic record of the content of a ballot cast by a voter and recorded by a voting device. Rule 1SER04-1(4)(a). Testimony at trial clarified that the touchscreen machines are capable of storing a copy of each ballot cast by a voter that can later be retrieved if necessary. Pursuant to the emergency rule, a "ballot image report" means the printout of ballot images for each

machine or precinct generated. Rule 1SER04-1(4)(b). The "complete canvass report" means the voting system report from the machine recount that contains the results for each contest in each precinct. Rule 1SER04-1(4)(c).

If a manual recount becomes necessary, the canvassing board shall order the printing of one official copy of the ballot image report from each touchscreen voting machine that has recorded undervotes for the affected race. Rule 1SER04-1(7)(a). If the certified voting system is capable of electronically sorting and identifying undervotes, then the canvassing board shall instead order the printing of the report using such capabilities. *Id.* The ballot image report shall then be examined by the counting teams to identify and highlight ballot images containing undervotes for the affected race to determine if there is a clear indication on the ballot image that the voter made a definite choice to undervote. Rule 1SER04-1(7)(b). For those machines capable of electronically sorting, the undervotes shall be identified by the machine. *Id.*

After identifying the undervotes, the counting teams shall maintain a running tally of the number of undervotes totaled per touchscreen voting machine in each precinct and then tabulate the total number of undervotes from all of the machines in that precinct. The counting teams shall then compare the total number of undervotes manually recounted for each precinct to the total number of undervotes reported by the voting system in the complete canvass report. Rule 1SER04-1(7)(e). If the comparison of the undervotes for each precinct matches the total number reported for such precinct, then the counting team shall certify the results of the machine recount to the canvassing board. Rule 1SER04-1(7)(f). If a discrepancy exists, however, then the counting teams

are to re-tabulate the number of undervotes for such precinct up to two additional times to resolve the discrepancy. *Id.* After the re-tabulation, if the discrepancy remains, then the canvassing board is to investigate and resolve the discrepancy with respect to such precinct. *Id.*

With respect to the process of tabulating the undervotes, the emergency rule explains how the certified touchscreen machines identify an undervote. "The clear indication that the voter has made a definite choice to undervote shall be determined by the presence of the marking, or the absence of any marking, that the manufacturer of the certified voting system indicated shall be present or absent to signify an undervote." Rule 1SER04-1(6)(b). The statute goes on to specify how an undervote is designated for the three types of touchscreen voting machines currently certified: 1) ES&S iVoting touchscreen voting system, 2) Sequoia touchscreen voting system, and 3) Diebold touchscreen voting system.

In the ES&S, an undervote is simply determined by the word "undervote" on the ballot image for the affected race or issue. Rule 1SER04-1(6)(b)(1). On the Diebold, an undervote is determined by the absence of an "X" within brackets located next to the candidates or choices for the affected race or issue. Rule 1SER04-1(6)(b)(2). Finally, in the Sequoia voting system, an undervote is determined by examining numeric codes. In this voting system, a candidate or issue is identified by a specific numeric code. When a voter does not vote for a race or issue, numeric codes fail to appear designating a particular candidate or issue. Thus, in the Sequoia voting system an undervote is determined by the absence on the ballot image of any numeric codes for the candidate

10

or choices for the given race or issue, or by the presence of less than the maximum number of numeric codes that may be present for any race in which the voter is permitted to select more than one candidate.  Rule 1SER04-1(6)(b)(3).   For instance, if the voter is permitted to choose three candidates in a given race, but only chooses two, an undervote is reflected by the presence of two rather three numeric codes for the designated candidates.

### D.     Procedural History of the State and Federal Suits

On January 16, 2004, Congressman Robert Wexler filed a complaint in state circuit court against Theresa Lepore, Secretary of State Glenda E. Hood, and the Palm Beach County Board of County Commissioners.  This state action seeks declaratory and injunctive relief on the grounds that Defendants, in approving a touchscreen voting machine for use in Palm Beach County, violated the right to vote of Palm Beach County citizens guaranteed by the Florida Constitution.  Specifically, the state complaint asserts that the Sequoia AVC Edge Voting System Release 3.1 should never have been approved and certified for use in Palm Beach County because as a paperless voting system, it does not allow for a manual recount as specified under sections 102.141 and 102.166 of the Florida statutes.  (*See* state court complaint, Wexler v. Lepore et al., No. 50 2004 CA 000491).

On February 11, 2004, the state circuit court issued its order dismissing the action on the grounds that plaintiff Wexler lacked standing to pursue the alleged claims.  *See* Wexler v. Lepore et al., No. 50 2004 CA 000491 (Fla. Cir. Ct. Feb. 11, 2004).  The court also found that Wexler failed to state a cause of action for injunctive relief because "the

11

Florida statutory scheme does not clearly require a voter verified paper ballot." *Id.* at 7. The state circuit court issued a Final Order of Dismissal With Prejudice on February 26, 2004.

On March 4, 2004, Plaintiff Wexler appealed the state circuit court order to the Fourth District Court of Appeal. The state appellate court filed its opinion affirming the circuit court's dismissal of Wexler's complaint with prejudice on August 6, 2004. *Wexler v. Lepore*, 878 So.2d 1276 (Fla. Dist. Ct. App. 2004). Though the appellate court disagreed with the circuit court's determination that Wexler lacked standing, it nevertheless affirmed the circuit court's dismissal. *See id.* The court found that the Secretary of State had adopted regulations regarding voting methods for recounting votes pursuant to the statutes.[7] The adoption of these rules rendered Wexler's request for a declaratory judgment moot since, at that point, the proper procedure was for Wexler to challenge the adopted rules. To this end, the court stated that "[w]hether these rules and regulations constitute an invalid exercise of delegated legislative authority is first subject to administrative challenge." *Id.* at 1281.

The state suit is currently pending before the Florida Supreme Court as Wexler has filed a notice, pursuant to Fla. R. App. P. 9.120, seeking to invoke the Court's discretionary jurisdiction as described in Fla. R. App. P. 9.030(a)(2)(A).

This federal action began when Plaintiffs filed their complaint on March 8, 2004. On May 24, 2004, this Court issued an order dismissing the Plaintiffs' complaint under the *Younger* abstention doctrine since it found that the federal suit would interfere with

---

[7] Specifically, the Secretary had adopted Rule IS-2.031, which required no manual recount for touchscreen machines, as will be discussed in greater detail below.

12

the state court action.  *See Wexler v. Lepore*, 319 F. Supp. 2d 1359 (S.D. Fla. 2004).

Plaintiffs appealed the decision to the Eleventh Circuit Court of Appeals.  On September

27, 2004, a panel of the Eleventh Circuit vacated this Court's decision to abstain under

*Younger* and remanded this action "for a determination of Appellant-Plaintiffs' claim."

*Wexler v. Lepore*, __ F.3d __, 2004 WL 2148325, *5 (11th Cir. 2004).  After denying

Defendants' petition for rehearing *en banc*, the Eleventh Circuit entered its mandate on

October 7, 2004 remanding the case to this Court [DE #52].  The Court recognizes that

the Eleventh Circuit framed the issue in the federal suit for consideration on remand as

follows:

> Fifteen Florida counties use a paperless, touchscreen method of voting. As is
> alleged, these touchscreen systems do not produce a paper record of votes.
> Accordingly, the fifteen counties where they are employed lack a manual recount
> procedure, which is available in Florida's remaining fifty-two counties. In the
> federal claim, Plaintiffs allege this "non-uniform, differential standard" violates
> their rights to due process and equal protection under the Fifth and Fourteenth
> Amendments to the United States Constitution.

2004 WL 2148325 at *1.

Upon notification of entry of the Eleventh Circuit's mandate on October 7, 2004,

this Court set a status conference for October 8, 2004.  At the status conference, the

Court directed that the bench trial would start October 18, 2004.  The trial concluded late

in the afternoon on Wednesday, October 20, 2004.

### CONCLUSIONS OF LAW[8]

Before commencing the legal analysis, it is important to properly frame the issue

before the Court.  On Friday, October 15, 2004, just prior to the start of the trial, the

---

[8]  To the extent any of these Conclusions of Law constitute Findings of Fact, they
are hereby adopted as both.

Department of State issued emergency rule 1SER04-1 establishing standards and procedures for conducting a manual recount on the touchscreen voting machines. Having established such standards and procedures, the Court must now determine whether the emergency rule complies with federal mandates governing equal protection and due process.  In other words, the Court must decide if the rule creates a uniform, nondifferential standard for conducting a manual recount in the fifteen counties using certified touchscreen machines.[9]  As part of this analysis, the Court must also examine whether the emergency rule complies with Florida's manual recount statutes.

### A.   *Bush v. Gore*

In analyzing the equal protection and due process challenge, the Court must inevitably look to *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525 (2000).  The context of that decision was the 2000 Presidential election, in which Florida engaged in a limited manual recount pursuant to Florida Statutes as a result of the margin of votes between George W. Bush and then Vice President Albert Gore, Jr.[10]  During the manual recount, questions arose in interpreting what constituted a legal vote, which the Florida Supreme Court had stated was "one in which there is a 'clear indication of the intent of the voter.'" *Id.* at 102 (citing *Gore v. Harris*, 772 So.2d 1243, 1257 (Fla. 2000)).  The United States Supreme Court found a violation of the equal protection clause because "[t]he recount mechanisms implemented in response to the decision of the Florida Supreme Court d[id]

---

[9] As noted above, the Eleventh Circuit also framed this as the issue before the Court. *See Wexler v. Lepore*, __ F.3d __, 2004 WL 2148325, *1 (11th Cir. 2004).

[10] Vice President Gore sought a manual recount in Volusia, Palm Beach, Broward, and Miami-Dade Counties, pursuant to Florida's election protest provisions then in effect.

not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" to vote  *Id*. at 105.

The crux of the problem was not with the definition of a legal vote, which looked to voter intent, but with its application during the recount process.  *See id* at 106.  As the Court explained, much of the controversy revolved around the punch-card voting system in which a ballot card is perforated by a stylus to indicate a vote.  Either through error or deliberate omission, certain cards were not perforated with sufficient precision for a machine to register the perforations as votes. See *id* at 105.  When conducting the manual recount, the counting teams had to determine whether to count as legal votes instances where a piece of the perforated card, or "chad," was hanging by one or several corners, as well as instances where there was no separation at all, but just an indentation.  The county canvassing boards also disagreed as to whether to count a "dimpled chad" where the voter was successfully able to dislodge the chad in every other contest on the ballot. *Id*. at 106 (citing *Gore v. Harris*, 772 So.2d at 1267 (Wells, C.J., dissenting)).   The result was the unequal evaluation of ballots in various respects throughout the affected counties.  "[T]he standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another."  *Id*.

In finding an equal protection violation under these circumstances, the Court stated that "[t]he problem inheres in the absence of specific standards to ensure its equal application."  *Id*. At 106. Without such standards, equal weight was not accorded to each vote, resulting in the arbitrary and disparate treatment of the members of the

electorate. *Id.* at 104-105. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* The Court concluded that "[t]he formation of uniform standards to determine intent" was "practicable and . . . necessary." *Id.* At 106. Based on this conclusion, the question currently before the Court is whether the State has established standards for conducting a manual recount that comport with equal protection.

### B.   Current Manual Recount Standards

Pursuant to section 102.166 of the Florida Statutes, the Department of State is given the responsibility to "adopt specific rules for each certified voting system prescribing what constitutes a 'clear indication on the ballot that the voter has made a definite choice,'" as well as to "adopt detailed rules prescribing additional recount procedures for each certified voting system which shall be uniform to the extent practicable." Fla. Stat. § 102.166(5)(b) &(6)(d). The Department of State has promulgated procedures and  standards for conducting a manual recount for *each* certified voting system. Rule 1S-2.031(6) sets forth the procedures for conducting a manual recount with respect to the optical scan voting systems and Rule IS-2.027 establishes the standards to determine what constitutes a legal a vote on these machines. Rule 1S-2.027 specifically delineates which stray marks on an optical scan ballot constitute a valid vote. Similarly, Emergency Rule 1SER04-1 sets forth the procedures for conducting a manual recount on touchscreen machines as well as the standards for determining what constitutes an undervote on the ES&S iVotronic, Sequoia, and Diebold systems. Through these rules, the Department of State has now

established a standard for manual recounts in counties using optical scan systems as well as a standard for counties using touchscreen voting systems.

Plaintiffs do not contest the creation of two sets of standards, one for each type of voting machine, since they do not contend that equal protection requires a state to employ a single kind of voting machine. Rather, Plaintiffs contest the standard itself in that it does nothing more than re-tabulate, by means of the ballot image reports, the number of undervotes in each touchscreen machine. Because there is no way of accurately determining a voter's definite choice through this process of re-tabulation, Plaintiffs argue that paperless touchscreen machines are incapable of conducting a manual recount. They specifically argue that there is no way of knowing from the ballot images whether an undervote recorded by the machine reflects the voter's deliberate choice not to vote, a mistake by the voter in choosing not to vote, or a mistake by the machine in recording an undervote. With optical scan equipment, in contrast, a voter's choice can be interpreted from stray marks on the ballot such as a circle around the name of a candidate or an arrow pointing to the candidate's name. Plaintiffs assert that this inability to determine whether a voter has made a definite choice after a ballot has been cast results in differential treatment of voters between counties using optical scan machines and those using touchscreen equipment. Defendants contend that manual recount standards are now in place, therefore equal protection concerns have been met.

Analyzing this issue, therefore, necessitates an examination of two interrelated and intertwined matters: 1) whether the standards established by the Department of State comply with the equal protection requirements of *Bush v. Gore,* and 2) whether the emergency rule complies with Florida statutes in determining whether an undervote

on a touchscreen machine reflects a voter's definite choice.[11]

       1.    *Equal Protection Requirements in Establishing a Uniform, Nondifferential Standard*

In *Bush v. Gore*, the Court found that standards were lacking for interpreting voter intent with respect to each kind of machine. The opinion described at great length the problems with the punch card voting system, which required interpretations of intent from hanging chads and indentations, and concluded that "uniform rules to determine intent based on *these* recurring circumstances" were practicable and necessary. 531 U.S. at 106. Equal protection concerns arose when disparate rules were applied to determine voter intent on "identical types of ballots used in identical brands of machines and exhibiting identical physical characteristics." *Id.* at 134 (Souter, J. Dissenting).[12]  In addition, the Court determined that uniform *statewide* standards in the treatment of votes during a manual recount were lacking. It found that in three counties, recounts were not limited to undervotes, but extended to all of the ballots. *Id.* at 107-08. The Court found the distinction to have real consequences, stating as follows:

> As a result, the citizen whose ballot was not read by a machine because he failed to vote for a candidate in a way readable by the machine may still have his vote counted in a manual recount; on the other hand, the citizen who marks two candidates in a way discernible by the machine will not have the same opportunity to have his vote count, even if a manual

---

[11] These matters are equally important and are discussed in this order simply because this Court's jurisdiction derives from the federal law issue. The Court believes that if the Emergency Rule failed to comport with Florida law, that fact alone could have led to a decision in the Plaintiffs' favor.

[12] As noted by the majority opinion, Justice Souter, along with Justice Breyer, agreed that the Florida Supreme Court's standardless recount violated equal protection principles, but differed with the majority over the remedy. Id. at 111.

examination of the ballot would reveal the same indicia of intent.

*Id.* at 108.  Vote counts based on these variant standards also violated equal protection.

In response to the election problems of 2000, the Florida legislature revised Florida's election laws in 2001.  As part of that reform, the manual recount statute, 102.166, was amended to specify that a manual recount be conducted of both the overvotes and undervotes.  *See* Senate Bill 1118, April 25, 2001, at 1271-72[13]; *see also Review of Voting Irregularities of the 2000 Presidential Election*, Report Number 2001-201, at 38, Plaintiff's Exhibit 7.  The Statute was also amended to delete the section that allowed the candidate requesting a manual recount to select which precincts to be counted.  Section 102.166(4)(d) previously prescribed that the manual recount had to include at least three precincts and "the person who requested the recount shall choose three precincts to be recounted."[14]  See Senate Bill 1118 at 1272.  Under the current statute, a manual recount includes "the entire geographic jurisdiction of such office or ballot measure."  Fla. Stat. § 102.166(2)(a).  Most importantly, as discussed above, the amendments also added language directing the Department of State to adopt specific rules for each certified voting system, prescribing what constitutes a voter's

---

[13]  Senate Bill 1118 was the final bill that enacted the 2001 revisions to Florida's election laws.

[14]  In the Report regarding the Voting Irregularities of the 2000 election, the Committee on Ethics and Elections reasoned that this standard of allowing the candidate to choose the three precincts was "ineffectual."  The Committee stated as follows: "Presumably, precincts will be selected where there is the greatest chance to garner additional votes for the challenging candidate, frequently precincts where the vote count for the challenging candidate is highest.  This can result in a skewed sample not representative of the other precincts in the county. . . This standard is ineffectual." *Review of Voting Irregularities of the 2000 Presidential Election*, Report Number 2001-201, at 37-38.   Plaintiff's Exhibit 7.

definite choice.  *See* Fla. Stat. § 102.166(5)b).

The Court finds that the rules promulgated pursuant to the amended statutes comply with the requirements established by *Bush v. Gore.*  Defendants have prescribed uniform, nondifferential standards for what constitutes a legal vote under each certified voting system, and have established procedures for conducting a manual recount of overvotes and undervotes in the entire geographic jurisdiction.  *See* Rules 1S-2.031(6), IS-2.027, and 1SER04-1.

### 2.    *Compliance With State Statutes*

The Court must now turn to the second matter, that of determining whether the emergency rule complies with Florida's statutory requirements.  This requires examining whether the rule prescribes what constitutes an undervote on a touchscreen machine, as well as whether it establishes a way to ascertain that a voter has made a definite choice.[15]  The Court finds that the emergency rule complies with the state statutes in both respects.

The rule prescribes what constitutes an undervote.  It states that "[t]he clear indication that the voter has made a definite choice to undervote shall be determined by the presence of the marking, or absence of any marking, that the manufacturer of the certified voting system indicates shall be present or absent to signify a vote." Rule 1SER04-1(6)(b).  The ballot image reports allow the recount teams to determine if an undervote was cast in a particular race or issue.  However, Plaintiffs' problem lies with

---

[15]  Fla. Stat. § 102.166(5)(a) states that "[a] vote for a candidate or ballot measure shall be counted if there is a clear indication on the ballot that the voter has made a definite choice."

the second part of the analysis. They argue that it is impossible to ascertain deliberate choice from the ballot image report because there is no way of knowing whether an undervote recorded by the machine reflects the voter's deliberate choice not to vote, a mistake by the voter in choosing not to vote, or a mistake by the machine in recording an undervote. Whether the machine made a mistake in recording an undervote is not an issue before the Court. Concerns about physical and communication security, software configuration, and system malfunction are investigated and dealt with by the State during the certification process. Both prior to and after certifying the machines, the State has procedures and testing mechanisms in place to ensure that the machines work accurately. *See* Fla. Stat. §§ 101.5605, 101.5607, 101.5612.[16]

With respect to the issue of whether the machine records the voter's intent not to vote or a mistake by the voter, the Court concludes that the current language of the statute does not inquire into the intent of the voter in attempting to discern a legal vote; rather the statute seeks to ensure that the voter has made a definite choice. Plaintiffs use the word intent and choice interchangeably. Yet, the Court finds them to be different. Prior to the 2001 amendments to the election statutes, a legal vote was determined by a clear indication of the intent of the voter. The prior version of the statute, at section 102.166(7)(b), read as follows: "If a counting team is unable to determine a voter's intent in casting a ballot, the ballot shall be presented to the county canvassing board to determine the voter's intent." *See* Senate Bill 1118, at 1272.

---

[16] Plaintiffs' complaint did not assert claims based upon any alleged deficiencies in the areas of ballot security, software configuration, and system malfunction. Though testimony at trial was elicited on these topics, such claims are not before this Court in this lawsuit.

Under the current standard, a legal vote is determined by a "clear indication on the ballot that the voter has made a definite choice." *See id.* at 1272; *see also* Fla. Stat. § 102.166(5)(a).  When the Legislature makes a change in the statute, it is presumed to mean something by that change.[17]  The earlier "intent" standard of section 102.166(7)(b) attempted to discern, *ex post*, a voter's state of mind; the amended standard instead looks to whether the ballot indicates that the voter has made a definite selection.

Thus, in the context of touchscreen voting machines, the "definite choice" standard entails determining whether the voter has made a definite selection rather than ascertaining a voter's intent, i.e., did a voter intend not to make a selection or did the voter unintentionally make a mistake in using the equipment.  The Court finds that by pressing the button to cast his or her ballot on the touchscreen machines, the voter is making a definite selection. In warning the voter of an undervote and allowing for a review process before the ballot is cast, touchscreen machines provide sufficient safeguards to ensure that a voter's undervote is intentional.  As a result, the ballot images printed during a manual recount pursuant to the Emergency Rule reflect a voter's choices under the statutory scheme adopted by the Florida legislature.[18]

---

[17] *See Carlile v. Fla. Game & Fresh Water Fiss Comm'n*, 354 So.2d 362, 364 (Fla. 1977)("When a statute is amended, it is presumed that the Legislature intended it to have a meaning different form that according to it before the amendment.  In making material changes in the language of a statute, the Legislature is presumed to have intended some objective or alteration of the law, unless the contrary is clear from all the enactments on the subject.").

[18] Federal law does not require Florida to have voting equipment which distinguishes between an intentional and unintentional undervote.  Following the problems of making such determinations as to punch-card ballots used in the 2000 election, the Florida legislature decided to allow use of touchscreen paperless voting systems which eliminate the need for such determinations.

Ultimately, the inability to later discern during a manual recount of touchscreen machines whether a voter has made a deliberate choice, in contrast to the ability to interpret stray marks on optical scan ballots, has to do with the differences between these two kinds of machines.  Touchscreen machines eliminate the problems confronted during the 2000 election in having humans interpret voter intent based upon ambiguous markings of the voter.  The machines are designed so that overvotes are impossible and a voter is warned of the presence of an undervote on the ballot.  In addition, the machines provide for a review of the ballot by the voter prior to it being cast.  Despite the warnings and review process, it is possible that a voter will not understand how the machines function and cast an incorrect vote.  In order to minimize voter mistake, counties engage in voter education.  *See* Fla. Stat. § 98.255, Voter Education Programs. Regardless of the voting system employed, however, there will always exist voters who do not follow the directions and will make mistakes.  As evidenced repeatedly at trial, no voting system is perfect.[19]  Distrust in an electorate's ability to properly use new technology does not give rise to an equal protection violation.[20]

Based upon the record evidence, the Court notes the preferable voting system would include a paper printout reviewed by the voter to ensure that it contains his or her

---

[19] The Ninth Circuit in *Weber v. Shelly* also found that "No balloting system is perfect, stating that "[t]raditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, 'hanging chads,' and other mechanical and human errors that may thwart intent." 347 F.3d 1101, 1106 (9th Cir. 2003).

[20]  This is especially true when the election statutes provide under Voter Responsibilities that a voter is responsible for "[f]amiliariz[ing] himself or herself with the operation of the voting equipment in his or her precinct."  Fla. Stat. § 101.031.

selections, which the voter then places in a ballot box to be counted in the event a manual recount is required.  However, this Court's authority in this case is not to choose the preferable method of casting a ballot, but to determine whether the current procedures and standards comport with equal protection.  The Court concludes that Defendants have established a uniform, nondifferential standard for conducting a manual recount in the fifteen counties using touchscreen machines, and as such, there is no constitutional violation found.

## CONCLUSION

Plaintiffs have failed to meet their burden of proving by a preponderance of the evidence that there exists a "nonuniform, differential standard" for conducting manual recounts in those Florida counties using the touchscreen paperless voting systems.

The adoption of Emergency Rule 1SER04-1 by the Department of State establishes a manual recount procedure for touchscreen voting systems, which not only meets the statutory requirements for manual recounts under Florida law, but also establishes a uniform, nondifferential standard for conducting manual recounts in compliance with equal protection guarantees.

Accordingly, it is thereupon

**ORDERED AND ADJUDGED** that Plaintiffs' claim for declaratory and injunctive

relief be **DENIED**, and Judgment entered in favor of Defendants and against Plaintiffs.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, on this 25th

day of October, 2004.

**JAMES I. COHN**
**UNITED STATES DISTRICT COURT**

25

Copies provided to:
Jeffrey M. Liggio, Esq.
Jason Vail, Esq.
James A. Peters, Esq.
George L. Waas, Esq.
Ronald A. Labasky, Esq.
Paul C. Huck, Jr., Esq.
Norman Ostrau, Esq.
Robert Peck, Esq.